T.C. Memo. 2005-277


UNITED STATES TAX COURT


K & M LA BOTICA PHARMACY,
INCORPORATED, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10500-99, 17346-99,    Filed December 1, 2005.
              17725-99,  8134-00.


Larry M. Bakman and Ronald S. Marks, for petitioners.

Ric D. Hulshoff, Loren B. Mark, Ronald S. Chun, Angelique M.

Neal, and Daniel M. Whitley, for respondent.

---

[1] Cases of the following petitioners are consolidated herewith:  Khaled Ahmed, docket No. 17346-99; Khaled Ahmed, docket No. 17725-99; and K & M La Botica Pharmacy, Inc., docket No. 8134-00.

## MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in and additions to petitioners' respective individual and corporate Federal income tax liabilities, as follows:

Khaled Ahmed, Docket Nos. 17346-99 and 17725-99

| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(f) | Sec. 6654 | Sec. 6663(a) |
|------|-----------|-----------------|--------------|-----------|--------------|
| 1995 | $   25,790 | $   4,628 | – | – | $   19,343 |
| 1996 | 299,639 | – | – | – | 224,729 |
| 1997 | 1,382,352 | 345,236 | – | – | 1,036,764 |
| 1998 | 3,121,466 | – | $2,341,100 | $141,678 | – |

K & M La Botica Pharmacy, Inc., Docket Nos. 8134-00 and 10500-99

| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(f) | Sec. 6654 | Sec. 6663(a) |
|------|-----------|-----------------|--------------|-----------|--------------|
| 1995 | 114,643 | – | – | – | 85,982 |
| 1996 | 80,552 | 22,647 | – | – | 60,414 |

Based on petitioner Khaled Ahmed's (Ahmed) and his wife's joint Federal income tax returns for 1995, 1996, and 1997 that were filed with respondent, respondent's notices of deficiency for those years were issued to both Ahmed and to his wife.  Ahmed and his wife's joint Federal income tax return for 1998 was not filed until after respondent had prepared a substitute tax return and had issued a notice of deficiency for 1998 to Ahmed individually.

All of respondent's income and expense adjustments reflected in the above notices of deficiency relate just to Ahmed's separate business activities, and respondent's determinations of fraud do not relate to Ahmed's wife.  Ahmed's wife did not join Ahmed in filing the instant petition.

For convenience, we generally refer herein to the above Federal income tax returns for 1995 through 1998 relating to Ahmed and to his wife and to respondent's notices of deficiency for 1995 through 1997 relating to Ahmed and to his wife as if the tax returns were filed by and as if the notices of deficiency were issued only to Ahmed.

After a difficult and lengthy trial and following the settlement by the parties of many issues (including agreement for 1997 and 1998 as to the nominee status of various entities Ahmed controlled and as to the income and expenses of those entities to be charged to Ahmed individually), the only issues remaining for decision in these consolidated cases relate to Ahmed's liability for 1995, 1996, and 1997 as to the civil fraud penalty and for 1998 as to the fraudulent failure to file penalty and petitioner K & M La Botica Pharmacy, Inc.'s (K & M), liability for 1995 and 1996 as to the civil fraud penalty.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time the petitions were filed, Ahmed lived in Downey, California, and K & M's principal place of business was located in Huntington Park, California.

Ahmed

Ahmed was born in Cairo, Egypt. From Cairo University, Ahmed received a degree in pharmaceutical science. From Elsayada University, also located in Cairo, Ahmed received a master's degree in biochemistry. Ahmed never obtained a medical degree or a medical license.

In late 1990, Ahmed moved from Egypt to the United States and began pharmacology studies in a doctoral program at St. John's University in New York. Ahmed did not complete his pharmacology studies, but apparently Ahmed did obtain pharmacist's licenses in several States.[2]

In 1992, Ahmed moved from New York to southern California.

In California, Ahmed obtained a real estate broker's license, and Ahmed took various M.B.A. courses. Ahmed also was involved in real estate speculation and property management, and he considered forming a tax preparation service.

As a businessman, Ahmed appears to understand financial, legal, tax, and general business concepts.

---

[2] On his resume, Khaled Ahmed (Ahmed) is listed as a licensed pharmacist in California, Illinois, Nevada, New Jersey, New York, and Texas.

As discussed below, during the years 1993 through 1998, Ahmed formed and operated several pharmacies, medical clinics, and a medical laboratory.  In connection with his various business activities, Ahmed obtained licenses from the Food and Drug Administration, the Drug Enforcement Agency, and the California Department of Health Services.  Ahmed supervised contracts with health maintenance organizations, health insurance companies, and Medi-Cal.[3]

Ahmed was familiar with the extensive Federal and State regulations relating to the operation of pharmacies, medical clinics, and medical laboratories and with the buying and selling of pharmaceutical products.

In the course of his business activities, Ahmed hired, paid, and actively directed and micro-managed the work of numerous medical, financial, and legal professionals.  Ahmed personally prepared and/or reviewed financial statements and various legal documents relating to his business activities.  Ahmed was involved in the preparation and execution of sale agreements and promissory notes, the maintenance of books and records, the preparation of financial statements, initiating, prosecuting, and supervising court cases (including the instant consolidated tax cases), and the preparation of Federal income tax returns.

---

[3] Medi-Cal is a California program which provides health-care related financial assistance for low-income individuals.

Formation and Operation of Pharmacies,
Medical Clinics, and Medical Laboratory

During the 4 years at issue herein (1995 through 1998), corporate entities which Ahmed nominally established in connection with the operation of his pharmacies, medical clinics, and medical laboratory, included, among others, the following:

> K & M;
> Clinica Santa Maria, Inc.;
> Clinica Kholy Medical Group, Inc.;
> Clinica Leslie Medical Group, Inc.;
> Madina, Inc.;
> Reem Management Group, Inc.;
> Macca Corporation, Inc.;
> Apex Medical Lab, Inc.; and
> Apex Reference Lab, Inc.

Hereinafter, we sometimes refer to the above entities formed by Ahmed as the "nominee entities" -- reflecting the fact that Ahmed, during at least 1997 and 1998, personally and solely managed and controlled essentially all significant aspects of the operations and activities of the pharmacies, the medical clinics, and the medical laboratory; that Ahmed treated the nominee entities as his alter ego; and that for Federal income tax purposes for 1997 and 1998 all income and expenses of the nominee entities are to be charged to Ahmed personally.

In the latter half of 1993, using his health care expertise and business experience, Ahmed opened in the Los Angeles metropolitan area his first pharmacy, doing business under the

name of La Botica Pharmacy. Apparently, in 1994, Ahmed opened a second pharmacy located a few blocks from his first pharmacy. Initially, Ahmed owned and operated the pharmacies as a sole proprietorship.

On August 5, 1994, Ahmed incorporated K & M, the other petitioner in these consolidated cases, to nominally own and to operate the pharmacies.[4] Ahmed was the president and sole shareholder of K & M.

The pharmacies were located in a predominantly low-income neighborhood with a large immigrant population.

In connection with their purchase from Ahmed's pharmacies of prescription and over-the-counter (OTC) drugs and other medical products, most of the customers received financial assistance from Medi-Cal.

In order to be qualified to bill Medi-Cal, an individual pharmacist first would have to apply to the State of California for a Medi-Cal provider number. Alternatively, the owner of a pharmacy could secure a group provider number that would cover all pharmacists working at a particular pharmacy. Apparently

---

[4] Hereinafter in these findings of fact, use of various words connoting ownership often are used for convenience and, unless the text suggests otherwise, are not necessarily intended to constitute affirmative factual findings as to the true ownership of the pharmacies, the clinics, and the laboratory, and the other property described herein.

Ahmed secured Medi-Cal group provider numbers for each of the K & M pharmacies.

When customers would make purchases of prescription and OTC drugs and other items from Ahmed's pharmacies, the customers would present their Medi-Cal cards to the pharmacy cashiers. The cashiers would use an online system to determine the validity of the customers' Medi-Cal cards and whether Medi-Cal would approve the purchases.

If Medi-Cal approval was received, the cashiers would complete the transactions with the customers, the customers would make no payment to the pharmacies, and K & M later would be paid by Medi-Cal.

Ahmed's pharmacies also made sales to customers of prescription drugs and of medical supplies that were paid for by the customers with cash.

Ahmed's pharmacies also sold to customers various alternative medicinal items and nonmedicinal products such as tea packs, herbal remedies, toiletries, bandages, soft drinks, and snacks. Medi-Cal did not cover these products, and customers generally paid the pharmacies for these products with cash.

## 1996

Sometime in early 1996, using K & M corporate funds, Ahmed opened a medical clinic under the name of Clinica Santa Maria. The clinic was located in the same neighborhood as the

pharmacies, and the clinic billed Medi-Cal for medical services provided to low-income individuals.

California law prohibits individuals from owning or operating a medical clinic unless they are medical doctors and are licensed to practice medicine in California.[5]

As indicated, Ahmed did not have a medical license. To circumvent the above restriction on ownership of his medical clinic, Ahmed represented to the Medical Board of California (Medical Board) that his clinic was owned by a partnership between one Wael Elkholy (Elkholy) and Ahmed's wife, both of whom were medical doctors. Elkholy, who apparently resided in Connecticut, did not know of his purported ownership interest in the clinic, and he did not authorize Ahmed to represent to the Medical Board that he had an ownership interest in the clinic. The record herein is unclear as to whether Ahmed's wife knew that Ahmed had used her name in connection with the clinic or if she had authorized Ahmed to do so.

In the early 1990s, Ahmed had met Elkholy in New York City, while each, respectively, was studying for the pharmacy and for

---

[5] See Cal. Bus. & Prof. Code secs. 2415, 2285 (West 2003 & Supp. 2005); Steinsmith v. Med. Bd., 85 Cal. App. 4th 458 (2000). In addition, Cal. law requires shareholders, officers, and directors of medical clinics to be licensed physicians. Cal. Bus & Prof. Code sec. 2408 (West 2003 & Supp. 2005); Cal. Corp. Code sec. 13401 (West 1987 & Supp. 2005).

the medical boards. Ahmed and Elkholy both had lived in the same neighborhood, and both had worked in the same New York City hospital.

By 1993, Elkholy had obtained a medical degree and a California medical license. Ahmed's wife had obtained a medical degree but apparently was not licensed to practice medicine in California.

To increase prescriptions filled by Ahmed's pharmacies, Ahmed established a procedure for the medical clinic under which drug prescriptions would not be given directly to patients of the clinic; rather, clinic employees would deliver or would fax drug prescriptions for clinic patients directly to Ahmed's pharmacies. Ahmed threatened to terminate clinic employees who did not follow this procedure.

Also, Ahmed established a policy for his medical clinic that each patient was to receive either an x ray, a lab test, or a shot, and each patient was to be provided a prescription. These services and prescriptions were provided to each patient of Ahmed's clinic regardless of the medical necessity and were intended to increase revenue for Ahmed's pharmacies and clinic.

On June 13, 1996, Ahmed caused his accountant, one Ahmad Saghir (Saghir), to prepare and to file articles of incorporation for Clinica Santa Maria, Inc. (CSM). Without Elkholy's permission or knowledge, Elkholy was identified as the sole

officer and shareholder of CSM, and Ahmed forged Elkholy's signature on CSM's articles of incorporation.

Ahmed also forged Elkholy's signature and used Elkholy's name on other CSM documents in order to obtain for CSM a Medi-Cal provider number and an employee ID number, to obtain credit from vendors, to file corporate Federal income tax returns, and to open bank accounts.

From the summer of 1996 through April of 1998, Elkholy, without being made aware of his nominal "ownership" interest in CSM, provided certain consulting services to CSM for which he received from CSM payments of $2,000 a month.

In September of 1996, Ahmed opened another pharmacy under the K & M name as a "closed-door" pharmacy in the same neighborhood as Ahmed's other pharmacies and as the CSM medical clinic. This third pharmacy did not have walk-in customers or regular business hours. Instead, this pharmacy operated as an overflow pharmacy for the other two pharmacies.

Whenever the other pharmacies had a backlog of prescriptions to fill, Ahmed would contact an on-call pharmacist who would come into the closed-door pharmacy and fill the prescriptions which the other pharmacies were not able to fill.

1997

In 1997, Ahmed opened another closed-door pharmacy under the K & M name and three additional medical clinics under the CSM name, each in the same neighborhood as the other pharmacies and clinic.  One of the clinics functioned as an educational clinic and did not treat patients in the traditional sense.  Rather, in this clinic, classes relating to family planning and to the prevention of sexually transmitted diseases were held for residents of the community, for which classes the clinic received payment from the State of California.

Title to the building in which one of Ahmed's pharmacies and one of his medical clinics were located was in the name of K & M.

On approximately April 28, 1997, Ahmed forged Elkholy's signature on an amendment to the CSM articles of incorporation to change the CSM corporate name to Clinica Kholy Medical Group, Inc. (CK).  The stated reason for this name change was that another medical clinic in California already operated under the name of Clinica Santa Maria.

In October of 1997, while Elkholy was on a trip to California, Ahmed offered to sell to Elkholy for $600,000 a 50-percent interest in the medical clinics being operated under the CK name, 100 percent of the stock of which, as indicated, was already in Elkholy's name.  At that time, Elkholy did not know that he was identified in California State records as the nominal

owner of CK, and Elkholy was not aware of the name change from "Clinica Santa Maria" to "Clinica Kholy".

Elkholy returned to Connecticut without deciding whether to purchase an interest in the medical clinics.

In November of 1997, Ahmed began negotiating for the sale of one of the medical clinics (the Lynwood Clinic) to a Dr. Basil Falahy (Falahy). Ahmed conducted the negotiations with a Patricia Fusilier (Fusilier) as a representative of Falahy. During the negotiations, Ahmed represented that Elkholy owned the Lynwood Clinic and that Ahmed only acted on Elkholy's behalf.

Later in 1997, Elkholy contacted Ahmed's accountant Saghir and inquired into the $600,000 proposed price for the purchase of an interest in the medical clinics. Saghir suggested to Elkholy that the asking price was too high, and Saghir informed Elkholy that Ahmed already was using Elkholy's name in connection with the operation and ownership of the medical clinics. Elkholy contacted Ahmed, and Ahmed denied using Elkholy's name in connection with the clinics.

In late 1997, the California Board of Pharmacy (Pharmacy Board) began an investigation of the operation of the K & M pharmacies for possible violations of California law. To conceal his ownership of the pharmacies from the Pharmacy Board, Ahmed transferred nominal ownership of the K & M pharmacies to Hussein Darwish (Darwish), one of the employees at the pharmacies.

On December 19, 1997, at Ahmed's request and on Ahmed's behalf, Saghir prepared and filed articles of incorporation for a corporation to be named Madina, Inc. (Madina), to which the pharmacies nominally were to be transferred. Darwish was identified as the sole shareholder of Madina. Ahmed then caused Saghir to prepare a series of documents reflecting, among other things, a purported transfer of ownership of the pharmacies from Ahmed to Darwish for a total stated purchase price of $170,000, to be reflected by a purported $20,000 cash downpayment from Darwish to Ahmed and by a purported $150,000 promissory note from Darwish to Ahmed.

Notwithstanding the contents of the above documents and the purported sale of the pharmacies, Ahmed was the sole owner of the stock of Madina, and Ahmed retained actual control of the pharmacies.

Sometime in 1997, Ahmed used funds from K & M to open a medical laboratory using the name Apex Medical Lab. The lab was located near Ahmed's pharmacies and clinics and derived most of its business from customers and patients of Ahmed's pharmacies and clinics.

To avoid scrutiny by California State health care officials, who were already investigating the other businesses Ahmed controlled, Ahmed arranged for nominal ownership of the lab to be put into Darwish's name.

On December 19, 1997, on Ahmed's behalf, Saghir prepared and filed articles of incorporation for Apex Medical Lab, Inc. (AML). Darwish was identified as the sole shareholder of AML. As with the incorporation of Madina, at Ahmed's request Darwish signed various documents relating to the incorporation of AML. Darwish understood that Ahmed was the actual owner of the lab and of AML.

1998

On January 5, 1998, Falahy began managing, as if he were the owner, the Lynwood Clinic, even though his pending purchase of the Lynwood Clinic was not complete.

In early 1998, after several rounds of negotiations and multiple revisions of the proposed sale agreement, Ahmed and Falahy agreed in principle to the sale of the Lynwood Clinic to Falahy for an estimated sales price of between "$100,000 and $150,000". Falahy, however, did not sign the final sale agreement because the agreement did not reflect an original signature of Elkholy, the purported owner. The sale apparently was agreed to with a "handshake" between Ahmed and Falahy but with no signed written agreement. The record is unclear as to the final agreed purchase price.

Falahy began making installment payments on the purchase of the Lynwood Clinic. At Ahmed's request, when Falahy's checks were delivered to Ahmed, the payee line on Falahy's installment checks was left blank, and Ahmed apparently would fill in the

payee line on the checks with either "Cash", his own name, or with the name of his mother. Falahy's first four installment checks delivered to Ahmed relating to Falahy's apparent purchase of the Lynwood Clinic totaled $66,000.

In April of 1998, because of his conclusion that Ahmed's various pharmacies, medical clinics, and lab were engaging in illegal medical and business practices, Darwish terminated his employment and any further association with Ahmed's pharmacies, clinics, and lab.

Even after Darwish terminated his affiliation with Ahmed, in the operation of the lab Ahmed continued to use Darwish's name and a stamp for Darwish's signature.

Upon receiving from Darwish complaints about the continued use of Darwish's name in connection with operation of the lab, Ahmed transferred nominal stock ownership of AML to his father.

In May of 1998, Elkholy took a leave of absence from Yale University School of Medicine, where he had been employed as an instructor, and he went to California to determine whether Ahmed in fact was using his name in the operation of the medical clinics, as Saghir claimed, and to further evaluate whether it would be a wise investment to purchase an interest in the medical clinics.

To this end, during May and June of 1998, Elkholy worked as an employee in the CK medical clinics. At the beginning of his

employment, Elkholy was led to believe by Ahmed that a Dr. Jules O'Laco (O'Laco) owned the clinics. The paychecks that Elkholy received bore the purported signature of O'Laco. O'Laco, however, did not actually sign the checks. Rather, Ahmed either forged O'Laco's signature on the checks or used a stamp for O'Laco's signature.

By June of 1998, it became apparent to Elkholy that Ahmed had used, and continued to use, Elkholy's name to circumvent California law relating to ownership of the medical clinics and to open bank accounts, and that the clinics were becoming known to the public under the name "Clinica Kholy".

Elkholy then took a number of steps to stop Ahmed from using his name. Elkholy went to the Medical Board in Sacramento and requested cancellation of his license to practice medicine in the State of California. At the end of June of 1998, Elkholy contacted local authorities. Based on Elkholy's complaints, the local sheriff temporarily removed the employees from the clinics and padlocked the doors. In December of 1998, Elkholy filed a lawsuit against Ahmed for Ahmed's unauthorized use of his name.

Within a week of the above closing of the clinics, Ahmed reopened the clinics under the nominal ownership of a Dr. Robert Leslie (Leslie), a doctor Ahmed recently had hired to work in the clinics.

On June 18, 1998, Ahmed formed Reem Management Group, Inc. (Reem), with himself as the sole shareholder. Reem purportedly was to manage and to operate the medical clinics which Leslie purportedly owned.

Ahmed's description of Reem as a management company was intended to provide a basis for Ahmed to represent that his personal management and control of the assets and of the operations of the medical clinics were legitimate even though nominal ownership of the clinics was held by Leslie.

Also in June of 1998, Falahy, who continued to make installment payments on his "purchase" of the Lynwood Clinic, learned that his sublease from CK of the clinic's office space was prohibited under the terms of the lease between CK and the lessor of the building and that CK was $35,000 delinquent in its lease payments due on the office space.

Elkholy then informed Falahy and Fusilier that he never possessed an ownership interest in CK or in any of the medical clinics, at which point Falahy stopped making payments on what he had thought was his purchase of the Lynwood Clinic from Elkholy.

In August of 1998, Ahmed went to the Lynwood Clinic with a couple of individuals dressed as security guards and ordered all of the individuals who regarded themselves as working for Falahy to leave the premises, physically prevented them from reentering

the premises to recover their personal property, and changed the outside door locks to the clinic.

After filing a lawsuit against Ahmed, Falahy eventually recovered personal property that he had left in the Lynwood Clinic, but Falahy never recovered the $66,000 he had paid Ahmed on the purchase of the clinic.

On August 4, 1998, Ahmed formed a new corporation named Apex Reference Lab, Inc. (ARL), to succeed AML and nominally to own and operate the lab. Ahmed was the sole shareholder and officer of ARL.

On September 25, 1998, Ahmed formed a corporation named Clinica Leslie Medical Group Inc. (CL). Leslie was identified as the sole shareholder and president of CL. Ahmed then filed documents with the State of California indicating that the clinics previously owned and operated under the name of CK thereafter were to be operated under the name and ownership of "Clinica Leslie".

To further obscure Ahmed's ownership of the clinics, Ahmed filed documents with the State of California falsely reflecting that the clinics had been sold by CK to Leslie. At trial, Leslie acknowledged that he was only a nominal owner of CL and of the clinics and that the actual owner of CL and of the clinics was Ahmed individually.

Other Property Transactions

During 1996, 1997, and 1998, Ahmed purchased various parcels of real property (including subsidized HUD properties).  To conceal his ownership of these properties, Ahmed caused title to the properties to be held either in the name of various nominee corporations or in the name of his relatives.

On May 6, 1997, Ahmed caused Saghir to incorporate Macca Corporation (Macca).  On documents filed with the State of California, one of Ahmed's relatives was listed as the president and sole shareholder of Macca.  Ahmed signed all of the Macca incorporation documents using the relative's name.

Ahmed's relative did not understand or know of the business purpose or of the operations of Macca, of Macca's business address, or of the location of Macca's books and records.  The relative did not sign documents on behalf of Macca, nor did he control Macca in any way.  Ahmed had complete control over Macca, its assets, and its operations.

Sometime in 1997, Ahmed caused K & M to quitclaim to Macca title to a building in which one of Ahmed's pharmacies and one of Ahmed's clinics were located.

Ahmed purchased various other parcels of commercial and residential property and put title to the properties in the name of Macca.  Ahmed used funds from the various pharmacies, clinics, and lab that he controlled to purchase the above properties.

On May 5, 1998, Ahmed formed K & M Luxor (KML) as a California corporation. A relative of Ahmed was identified as the sole shareholder of KML. Ahmed then caused Macca to transfer to KML, without consideration, some of the real properties Macca nominally owned.[6]

Ahmed's stated reason for incorporating KML and for transferring properties from Macca to KML was that Macca had taken over from ARL some aspects of the ownership and operation of the medical lab and that Ahmed did not want Macca's properties to be subject to any claims against Macca relating to the lab.

Additional Questionable Business
Practices and Diversion of Business Income

In the course of operating his controlled businesses and nominee entities, Ahmed entered into additional questionable business practices.

Ahmed often would deposit proceeds of one of his controlled entities or businesses into a bank account of another of his controlled entities or businesses or into one of his personal bank accounts. For example, Medi-Cal checks received in connection with services rendered at Ahmed's medical clinics often were deposited into bank accounts of K & M.

---

[6]For reasons not in the record, K & M Luxor has not been treated by respondent as a nominee entity of Ahmed.

Ahmed treated himself as owner of all of the nominee entities and freely intermingled their financial and business affairs with his own and without regard to their corporate status.

Ahmed would pay his personal expenses and expenses of entities he controlled with funds from his other controlled entities. For example, Ahmed used checks written on K & M's bank account to pay his personal credit card bills and the mortgage and property taxes on his personal residence. Also, during at least 1995 and 1996, Ahmed cashed checks payable to K & M and diverted the check proceeds to his personal use.

Employees of the pharmacies, the clinics, and the lab were instructed by Ahmed to leave in Ahmed's office at night cash sales proceeds of the pharmacies, the clinics, and the lab. Ahmed then would deposit only a portion of the cash sales proceeds into the bank accounts of his nominee entities, and Ahmed would divert the undeposited cash to his own personal use.

Ahmed engaged in "churning" lab managers. Ahmed would attract new managers to the lab by promising them above-market salaries. Ahmed would not pay the new managers, and when they complained, he would fire them. At least two of the above lab managers were successful in making claims against Ahmed for unpaid wages.

At some point, because Ahmed fraudulently billed Medi-Cal, the Federal Health Care Finance Administration took action against Ahmed, prohibiting Ahmed and some of his associates and nominee entities from owning or operating a medical lab.

Apparently, Ahmed and his wife were divorced in 1999.

Tax Returns

Ahmed's accountant Saghir prepared Ahmed's 1995, 1996, 1997, and 1998 individual Federal income tax returns, the latter of which, as indicated, was filed after respondent's notice of deficiency was issued to Ahmed. Saghir also prepared the corporate Federal income tax returns for the same years for Ahmed's nominee entities. On a monthly basis, Saghir would collect bank statements and canceled checks relating to the nominee entities, and he would use bank records to prepare a general ledger for each entity. Ahmed would assist Saghir in classifying the receipts and the expenses, and Saghir would prepare the nominee entity corporate Federal income tax returns based on the information reflected in the respective general ledger.

Generally, Ahmed did not inform Saghir of the cash and checks that the nominee entities received and that Ahmed did not deposit into the nominee entity bank accounts. As a result, certain cash proceeds were reflected neither in the general

ledgers of the nominee entities nor on Ahmed's or the nominee entities' Federal income tax returns.

Ahmed caused Saghir to miscategorize as business expenses certain of Ahmed's personal expenses that had been paid with nominee entity funds and caused Saghir to improperly categorize and record certain intercompany transactions.

After preparing Ahmed's Federal income tax returns and the corporate Federal income tax returns for Ahmed's nominee entities, Saghir would present the tax returns to Ahmed for review. After Ahmed reviewed the tax returns, Saghir would make any changes that Ahmed requested and then deliver the final tax returns back to Ahmed for signature and filing.

With the filing or submission of the above Federal income tax returns for 1995, 1996, 1997, and 1998, Ahmed and his nominee entities generally forwarded to respondent the tax balances reported due thereon.[7]

The schedule below summarizes the dates of incorporation of Ahmed's nominee entities and the filing (or submission) dates for Ahmed's and for the nominee entity Federal income tax returns for 1995, 1996, 1997 and 1998.

---

[7]The actual tax payments for which Ahmed, K & M, and Ahmed's nominee entities are to be credited are subject to the parties' Rule 155 computations herein.

| Taxpayer | Date Incorporated | Year and Tax Return Filing Dates | | | |
|---|---|---|---|---|---|
| | | 1995 | 1996 | 1997 | 1998 |
| Ahmed | – | 8/14/96 | 4/15/97 | 3/8/99 | 9/24/99 |
| K & M | 8/5/94 | 3/13/96 | 9/17/97 | ** | 9/21/99 |
| CSM/CK | 6/13/96 | | 9/17/97 | ** | ** |
| Macca | 5/6/97 | | | 9/24/99 | 9/24/99 |
| AML | 12/19/97 | | | * | * |
| Madina | 12/19/97 | | | * | ** |
| Reem | 6/18/98 | | | | 9/24/99 |
| ARL | 8/4/98 | | | | ** |
| CL | 9/25/98 | | | | 9/24/99 |

* No tax return filed with respondent.

** Tax return submitted to respondent's counsel but neither signed nor filed.

In the Appendix hereto, we set forth the separate and the aggregated total gross income, taxable income, and tax liabilities for 1997 and 1998 for Ahmed and for Ahmed's nominee entities as reported on the Federal income tax returns filed with or submitted to respondent.

Ahmed did not report on his 1995 and 1996 individual Federal income tax returns or on K & M's 1995 and 1996 corporate Federal tax returns the proceeds from checks made payable to K & M which Ahmed had, in at least 1995 and 1996, cashed and used for personal purposes.

On K & M's corporate Federal income tax returns for 1995 and 1996, there were deducted as "medical supplies expense" personal expenses of Ahmed that had been paid with K & M checks.

On Ahmed's individual Federal income tax returns for 1997 and 1998, and on the nominee entity corporate Federal income tax returns for 1997 and 1998, Ahmed did not report, among other things, the previously discussed cash sales proceeds of the nominee entities that were not deposited into the nominee entity bank accounts. At trial, Ahmed conceded that he had received unreported cash sales of $321,517 for 1997 and $344,869 for 1998.

Respondent's Audit

In October of 1997, respondent began an audit of K & M for 1995. Based on information set forth in informant letters and information obtained in the audit of K & M for 1995, respondent's agent expanded the scope of the K & M audit to include 1996 and Ahmed's 1995 and 1996 Federal income tax returns. Respondent's agent also began reconstructing K & M's and Ahmed's income and expenses for 1997 and 1998, as their respective Federal income tax returns for 1997 and 1998 had not yet been filed with respondent.

During the audits of K & M and of Ahmed, Ahmed was not forthcoming in his communications with respondent's agent. Ahmed attempted to conceal assets from respondent's agent, to impede respondent's examination, and in general Ahmed was uncooperative and evasive.

Respondent's agent sent various "Information Document Request" forms (IDRs) to Ahmed in connection with the audit of

K & M for 1995, but Ahmed failed to produce much of the information requested in the IDRs.

Due to Ahmed's failure to fully comply with the IDRs, respondent's agent served approximately 70 administrative summonses on K & M's suppliers, banks, and customers.

At the first meeting between respondent's agent and Ahmed, Ahmed falsely informed respondent's agent that the pharmacies did not have cash sales and that all of the sales proceeds of K & M were deposited into K & M bank accounts.  When respondent's agent confronted Ahmed with evidence of cash sales, Ahmed changed his story and admitted that the pharmacies had cash sales.

Ahmed told respondent's agent that he had made personal loans to K & M, but when respondent's agent asked Ahmed for documentation relating to the loans Ahmed told the agent that loan documentation did not exist.  Later, in December of 1997, Ahmed produced purported loan documentation relating to the alleged loans.

Ahmed denied having an ownership interest in CSM, CK, and CL, and in the medical clinics operated under those names.  Ahmed told respondent's agent that during the years at issue CSM, CK, CL, and the clinics were owned by Elkholy or later by Leslie. Ahmed represented that he acted only as a manager of the clinics on behalf of Elkholy and Leslie.

Ahmed denied having any connection to Macca, and Ahmed provided inconsistent information to respondent's agent about the sources of funds used to purchase properties held in Macca's name.

Although Ahmed controlled and had signatory authority over numerous personal bank accounts and bank accounts of the nominee entities, Ahmed did not cooperate in producing to respondent's examining agent the bank records relating to the operation of the pharmacies, the clinics, and the lab. Also, Ahmed instructed Saghir not to cooperate in turning over bank records and other records to respondent's examining agent. Further, Ahmed failed to acknowledge all of the bank accounts that he and his nominee entities maintained or utilized.

Ahmed prepared or caused to be prepared and provided to respondent a variety of false documents, such as minutes of nonexistent corporate meetings and sham sales documents.

Notices of Deficiency

After respondent's audit of Ahmed's 1995, 1996, and 1997 individual Federal income tax returns and of K & M's 1995 and 1996 corporate Federal income tax returns, and after the preparation by respondent of a substitute tax return for Ahmed for 1998, respondent determined the above Federal income tax deficiencies against Ahmed for 1995, 1996, 1997, and 1998 and against K & M for 1995 and 1996.

As indicated, for 1997 and 1998 respondent determined that the nominee entities, including K & M, constituted mere nominees of Ahmed personally, and respondent collapsed the nominee entities into the calculation of Ahmed's taxable income and Federal income tax for those years. On the notice of deficiency mailed to Ahmed for 1997 and 1998, respondent (after disallowing many claimed expenses) charged Ahmed with all items of income and all items of expense that respondent determined were allowable relating to the nominee entities.

Respondent determined that the civil fraud penalty under section 6663 was applicable to Ahmed for 1995, 1996, and 1997 and to K & M for 1995 and 1996. Respondent also determined that the fraudulent failure to file penalty under section 6651(f) was applicable to Ahmed for 1998 (because, as explained, Ahmed's 1998 Federal income tax return was not filed with respondent until after respondent's notice of deficiency to Ahmed for 1998 had been issued).

## Jeopardy Proceeding

On March 19, 1999, Ahmed cashed a $770,000 check drawn on a K & M bank account and used the proceeds to purchase a $770,000 cashier's check payable to himself.

On June 24, 1999, for 1995, 1996, and 1997, and on July 22, 1999, for 1998, respondent made jeopardy assessments against

Ahmed in the cumulative total amount of $1,426,038 relating to Ahmed's Federal income tax for the same years involved herein (namely, 1995, 1996, 1997, and 1998).

Ahmed challenged respondent's above jeopardy assessments in the Federal District Court for the Central District of California. In preparation for the court hearing relating to the jeopardy assessments, Ahmed had a document prepared by his attorney entitled "Declaration of Ahmad Saghir". Ahmed offered Saghir $3,000 and pressured Saghir to sign the declaration. Although Saghir felt threatened by Ahmed, Saghir did not sign the declaration because it contained false statements.

On August 18, 1999, the District Court sustained respondent's above jeopardy assessments on the ground that Ahmed appeared to be designing to place property and assets beyond the reach of the United States.

Stipulation as to Income and Expenses

As to 1995, 1996, 1997, and 1998, the parties have stipulated to the income and to the allowance or disallowance of all of the expenses claimed on Ahmed's and on the nominee entity Federal income tax returns as filed.

Also, as indicated, as to 1997 and 1998, the parties have stipulated to the collapsed treatment of Ahmed's nominee entities, i.e., that the stipulated income and the stipulated allowable expenses of the nominee entities are to be charged to

Ahmed for purposes of determining Ahmed's income and expenses and Ahmed's individual Federal income tax liabilities.

The schedule below compares, for 1995 and 1996, the gross income, the taxable income, and the tax liabilities of Ahmed and of K & M as reported on the filed tax returns with the gross income, the taxable income, and the tax liabilities of Ahmed and of K & M as stipulated herein:[8]

|  | 1995 | | 1996 | |
|---|---|---|---|---|
|  | Reported | Stipulated | Reported | Stipulated |
| **Ahmed's** | | | | |
| Gross Income | $ 49,000 | $ 113,390 | $ 40,500 | $ 95,698 |
| Taxable Income | 22,872 | 87,262 | 15,127 | 70,325 |
| Tax Liability | 3,431 | 19,367 | 2,269 | 14,478 |
| **K & M's** | | | | |
| Gross Income | 1,705,359 | 1,768,971 | 1,401,793 | 1,492,929 |
| Taxable Income | 7,361 | 112,875 | 60,148 | 202,839 |
| Tax Liability | 1,104 | 27,271 | 10,037 | 62,357 |

The schedule below compares, for 1997 and 1998, the aggregated gross income, taxable income, and tax liabilities of Ahmed and of the nominee entities as reported on the filed or submitted tax returns of Ahmed and of the nominee entities with

---

[8] On this schedule for 1995 and 1996, and on the next schedule for 1997 and 1998, see infra p. 32, we have estimated the Federal income tax liability of Ahmed and of K & M based on the stipulated income and expense amounts. The amounts indicated on these two schedules for the estimated tax liabilities are not binding on the parties, who will have the opportunity to submit tax calculations pursuant to Rule 155. The "reported" amounts include the amounts reported on the tax returns filed with respondent and also amounts reported on the tax returns that were submitted either before or during trial but which were neither signed nor filed with respondent.

the collapsed gross income, taxable income, and tax liabilities of Ahmed and of the nominee entities as stipulated by the parties herein.

| | 1997 | | 1998 | |
| | Aggregated | Collapsed | Aggregated | Collapsed |
| Ahmed | Reported | Stipulated | Reported | Stipulated |
| Gross Income | $2,562,506 | $2,557,113 | $5,493,205 | $6,277,825 |
| Taxable Income | 181,236 | 402,378 | 940,834 | 2,255,213 |
| Tax Liability | 36,896 | 133,652 | 257,153 | 866,668 |

Based on the above stipulated (and for 1997 and 1998 the collapsed) income and expense amounts, the schedule below reflects our calculations of the dollar amounts of, and the percentages for, the understatements of gross income, of taxable income, and of estimated tax liability that occurred on each of Ahmed's 1995, 1996, 1997, and 1998 Federal income tax returns.

| Ahmed's 1995 | Gross Income | Taxable Income | Tax Liability |
|---|---|---|---|
| As Stipulated | $113,390 | $87,262 | $19,367 |
| As Reported | 49,000 | 22,872 | 3,431 |
| Understatement | $ 64,390 | $64,390 | $15,936 |
| % Understatement | 57% | 74% | 82% |
| | | | |
| Ahmed's 1996 | | | |
| As Stipulated | $95,698 | $70,325 | $14,478 |
| As Reported | 40,500 | 15,127 | 2,269 |
| Understatement | $55,198 | $55,198 | $12,209 |
| % Understatement | 58% | 78% | 84% |
| | | | |
| Ahmed's 1997 (Collapsed) | | | |
| As Stipulated | $2,557,113 | $402,378 | $133,652 |
| As Reported | 2,562,506 | 181,236 | 36,896 |
| Understatement | ($ 5,393) | $221,142 | $ 96,756 |
| % Understatement | 0% | 55% | 72% |
| | | | |
| Ahmed's 1998 (Collapsed) | | | |
| As Stipulated | $6,277,825 | $2,255,213 | $866,668 |
| As Reported | 5,493,205 | 940,834 | 257,153 |
| Understatement | $784,620 | $1,314,379 | $609,515 |
| % Understatement | 12% | 58% | 70% |

Based on the stipulated income and expense figures, the schedule below reflects our calculation of the dollar amounts of, and the percentages for, the understatements of gross income, of taxable income, and of estimated tax liability that occurred on each of K & M's 1995 and 1996 corporate Federal income tax returns.

| K & M's 1995 | Gross Income | Taxable Income | Tax Liability |
|---|---|---|---|
| As Stipulated | $1,768,971 | $112,875 | $27,271 |
| As Reported | 1,705,359 | 7,361 | 1,104 |
| Understatement | $ 63,612 | $105,514 | $26,167 |
| % Understatement | 4% | 93% | 96% |

| K & M's 1996 | | | |
|---|---|---|---|
| As Stipulated | $1,492,929 | $202,839 | $62,357 |
| As Reported | 1,401,793 | 60,148 | 10,037 |
| Understatement | $ 91,136 | $142,691 | $52,320 |
| % Understatement | 6% | 70% | 84% |

OPINION

Respondent has the burden of proving by clear and convincing evidence that Ahmed for 1995, 1996, and 1997, and that K & M for 1995 and 1996 are liable for the civil fraud penalty under section 6663. Sec. 7454(a); Rule 142(b); Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249.

Respondent also has the burden of proving by clear and convincing evidence that Ahmed for 1998 fraudulently failed to timely file his individual Federal income tax return. Sec. 6651(f). For this purpose, we consider the same factors under section 6651(f) that are considered in imposing the fraud penalty under section 6663. Clayton v. Commissioner, 102 T.C. 632, 653 (1994).

The general elements of tax fraud that respondent must prove under sections 6663 and 6651(f) for each year for which fraud is asserted are: (1) An underpayment of tax; and (2) a specific intent to evade a tax known or believed to be owed. Bagby v.

Commissioner, 102 T.C. 596, 607 (1994); Stone v. Commissioner, 56 T.C. 213, 220-221 (1971).

To establish fraudulent intent, respondent must prove that a taxpayer intended to evade a tax known or believed to be owed by conduct intended to conceal, mislead, or prevent the collection of tax. Akland v. Commissioner, supra at 621; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958).

To find tax fraud against a corporation, respondent is required to prove that the controlling individuals engaged in fraudulent conduct on behalf of the corporation. Benes v. Commissioner, 42 T.C. 358, 382 (1964), affd. 355 F.2d 929 (6th Cir. 1966).

Fraudulent intent is rarely established by direct evidence, and various kinds of circumstantial evidence may be relied upon to establish fraudulent intent. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. As we have stated: "Generally, the evidence of fraudulent intent must be gleaned by surveying the whole course of conduct of the taxpayer with respect to the transactions in question. Although fraud is never to be imputed or presumed, its proof may depend to some extent upon circumstantial evidence". Stone v. Commissioner, supra at 224.

The Court of Appeals for the Ninth Circuit has identified "badges of fraud" from which fraudulent intent may be inferred. The nonexclusive list of badges of fraud includes:

(1) Understatement of income;

(2) inadequate records;

(3) failure to file tax returns;

(4) implausible or inconsistent explanations of behavior;

(5) concealing assets;

(6) failure to cooperate with tax authorities;

(7) engaging in illegal activities; and

(8) dealing in large amounts of cash.

See Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987); Bradford v. Commissioner, supra at 307-308; Baker v. Commissioner, T.C. Memo. 1991-340, affd. without published opinion 9 F.3d 1550 (9th Cir. 1993).

While the underreporting of income itself may be insufficient to support a finding of fraud, "repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Furnish v. Commissioner, 262 F.2d 727, 728 (9th Cir. 1958), affg. in part and remanding in part 29 T.C. 279 (1957). Consistent, substantial understatements of income for several years is highly persuasive evidence of intent to defraud the Government. Powell v. Granquist, supra at 60.

If respondent establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is

to be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes by a preponderance of the evidence is not attributable to fraud. Sec. 6663(b).

Ahmed, individually and as president of K & M for the years in issue, grossly understated his and K & M's taxable income, and he significantly underpaid the Federal income tax due, measured both in dollars and in percentages.

For the years in issue, Ahmed underreported his and K & M's taxable income by a cumulative total of $1,903,314, and he underpaid his and K & M's Federal income tax by an estimated cumulative total of $812,903, representing understatements of taxable income and underpayments of Federal income tax for each year of 55 percent to 96 percent.

Ahmed's underreporting over a period of at least 4 years of his and of K & M's taxable income and the related underpayment of Federal income taxes are persuasive evidence of Ahmed's fraudulent intent, particularly combined with the unreported cash proceeds and the claimed business deductions relating to personal expenses.

Further, Ahmed did not maintain adequate financial records relating to his business activities, demonstrated by the failure to properly account for certain intercompany transactions, to record certain cash transactions, and to properly report personal expenses paid out of corporate funds.

The Federal income tax returns which Ahmed filed for himself and for his nominee entities generally were filed late, and a number were filed after respondent's notices of deficiency were mailed to Ahmed.  Several of the nominee entity Federal income tax returns were never filed with respondent.  Ahmed did not file his 1998 individual Federal income tax return until after respondent had determined Ahmed's liability for the fraudulent failure to file penalty.

Ahmed took affirmative steps to conceal from respondent his ownership of various assets.  Ahmed repeatedly denied to respondent's agent that he owned interests in the corporations nominally operating the pharmacies, the clinics, and the lab.  Ahmed used other individuals' names to perpetuate the concealment of his ownership of the nominee entities.

Ahmed withheld from respondent's agent information about Ahmed's personal and nominee entity bank accounts.  After the issuance of the notices of deficiency, Ahmed, as determined by the District Court, designed to place assets beyond the reach of the United States.

Ahmed failed to produce financial records requested by respondent and actively hindered respondent's examination.  Ahmed misrepresented facts to respondent's agent, including the cash sales generated by the businesses and his relationship to the nominee entities.  Ahmed submitted various sham documents to respondent's agent.

Ahmed's testimony lacked credibility and was replete with inconsistencies.

Based on Ahmed's pattern of understating his and K & M's taxable income and of underpaying his and K & M's Federal income tax liabilities, and the conduct described above, we conclude that respondent has established by clear and convincing evidence that both Ahmed and K & M acted willfully and with specific intent to underpay their correct Federal income tax due for each year in issue. Ahmed and K & M have not established that any portion of the tax deficiencies is not attributable to fraud. Accordingly, the entire individual and corporate Federal income tax deficiencies, as determined herein, are subject to the relevant fraud penalties under sections 6663(a) and 6651(f).

We have considered all arguments made herein, and, to the extent not addressed, we conclude that they are without merit or are irrelevant.

To reflect the foregoing,

Decisions will be entered

under Rule 155.

APPENDIX

The schedule below sets forth the separate and the aggregated total gross income, taxable income, and tax liabilities for 1997 and 1998 of Ahmed and of his nominee entities, as reported on the Federal income tax returns that were filed with or submitted to respondent:

|  | Reported | | |
|---|---|---|---|
|  | Gross Income | Taxable Income | Tax Liability |
| **1997** | | | |
| Ahmed | $ 56,125 | $ 40,925 | $ 6,139 |
| K & M | 1,316,506 | 73,597 | 13,399 |
| CSM/CK | 1,148,093 | 54,385 | 15,509 |
| Macca | 41,782 | 12,329 | 1,849 |
| Madina | * | * | * |
| AML | * | * | * |
| Aggregated Total | $2,562,506 | $181,236 | $36,896 |
| **1998** | | | |
| Ahmed | $ 81,000 | $ 68,231 | $ 13,598 |
| K & M | 1,238,569 | 281,205 | 92,920 |
| CSM/CK | 1,177,522 | 191,810 | 58,056 |
| Macca | 236,064 | 71,416 | 12,854 |
| Madina | 731,593 | 90,420 | 18,993 |
| AML | * | * | * |
| Reem | 1,363,564 | 73,159 | 13,290 |
| ARL | 664,893 | 164,593 | 47,442 |
| CL | 0 | 0 | 0 |
| Aggregated Total | $5,493,205 | $940,834 | $257,153 |

* No Federal income tax return filed or submitted to respondent.